# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-567-2 (RCL)** |
| **CHARLES BRADFORD SMITH,** | |
| *Defendant.* | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Charles Bradford Smith, a.k.a. Brad Smith, to 44 months of incarceration, in the mid-range of the 41-51 months Guidelines range to which the parties stipulated in their plea agreement, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.    INTRODUCTION

Smith, who conspired for two months to stop the Congressional certification of the 2020 Presidential election by violence, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 police officers, and resulted in over $2.7 million in losses.[1]

---

[1]  As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

In the weeks leading up to January 6, 2021, Smith and his codefendant, Marshal Neefe, coordinated and planned to travel to Washington, D.C., on January 6 and were prepared to violently ensure that Donald Trump would remain president following Congress's certification proceeding, as both discussed bringing weapons to Washington.   Smith and Neefe participated with other members of a mob in hoisting and pushing a large metal sign frame into a defensive line of U.S. Capitol Police and D.C. Metropolitan Police Department officers on the West Front plaza of the Capitol.   After the officers' line broke, Smith spent time with the mob on the West Front plaza, encouraging other rioters to hold an exterior door shut against police attempting to exit and defend the Capitol.   During the evening hours and into the day following the Capitol breach, Smith showed no remorse.   Through Facebook, he expressed pride about getting tear gassed and delaying the Electoral College vote certification, ominously vowing "The time will come for some of them"; and stating, "But today's mission was successful! Remember how they said today was the final day & that Biden would be certified? Well we literally chased them out into hiding. No certification lol [. . .]"

As explained herein, a 44-month sentence would reflect the gravity of Smith's conduct but also acknowledge his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020, Presidential election.   Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they

ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the Presentence Report ("PSR") and the Statement of Offense incorporated into Smith's plea agreement, a joint session of Congress had convened at 1:00 p.m.[2]  at the Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.   By 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the Capitol.   Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

---

[2]  All times indicated in the factual background are approximate.

of the Capitol were locked or otherwise secured.   USCP officers attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law-enforcement officers along the way, while others in the crowd cheered them on.

At 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.   The proceedings resumed around 8:00 p.m. after the building had been secured.   Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed. (ECF 79 (Statement of Offense) at 1-3; PSR at 7-8.)

### Injuries to Police Officers Caused by the January 6, 2021, Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself.   *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the

rule of law.") (Chief Judge Howell).

In addition, the rioters injured over 100 police officers.  *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law-enforcement officers.  *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

### B.        Smith's Role in the January 6, 2021, Attack on the Capitol

#### *Prior Planning Leading Up to January 6, 2021*

From at least November 4, 2020, and continuing up to and including January 6, 2021, Smith and his coconspirator, Neefe, used Facebook to communicate with each other and others to express dissatisfaction with the results of the 2020 Presidential election and share thoughts about how Donald Trump could remain president following the certification of the Electoral College vote, set to occur in Washington, D.C., on January 6, 2021.

On November 4, 2020, the day after Election Day, Neefe wrote Smith, "Im getting ready to storm D.C. . . .   Seriously tho if biden wins theres a good chance ill do something for the better of man."   Smith remarked, "We all deep down knew this was how the election was going to go. Now if Trump wins the riots will be 50 times worse."   Neefe replied, "Hope it burns either way." Smith added, "Me to.   This country needs to split up immediately."   Neefe replied, "Why shouldnt we be the ones to kick it off?"

On December 1, 2020, in response to the election results, Smith messaged Neefe "This wouldn't be happening if Germany won," apparently referring to the outcome of World War II. "I'm real close to liking full blown fascism. Fascism is one of the most lied about political ideologies ever and if you look it up it'll give you like 6 completely different definitions but we all know what it is. Its culture, heritage, family history, tradition. And Nobody hates a Communist more than a fascist lol." Neefe replied, "Id rather be a racist, fascist hate monger than a liar 🧑." Smith responded, "If this is what winning the war means then I'm a fascist." On December 9, 2020, in response to another Facebook user's message about YouTube's new terms of service regarding election coverage, Smith wrote, "I know.   If SCOTUS doesn't act people are going to

die. I hope this starts the War."

As the formal voting by the Electoral College took place on December 14, 2020, Smith and Neefe exchanged messages as the votes came in through the next morning, expressing their displeasure with the results. On December 15, 2020, from 10:35-10:38 a.m., Smith wrote Neefe, "Everybody is saying it's over. He just needs to pull the Trump card and use the fucking military. It's completely botched unless he does something unprecedented that may lead to a Civil War." Neefe replied at 10:44 a.m., "Something has to happen dude."

In the weeks leading up to January 6, 2021, Smith and Neefe shared their intentions and plans to travel to Washington on that date with one another and others.  For example, on December 22, 2020, Neefe and Smith had the following conversation on Facebook:

SMITH:     The call to action was put out to be in DC on January 6th from the Don himself.  The reason is that's the day pence counts them up and if the entire city is full of trump supporters it will stop the for sure riots from burning down the city at least for a while.

NEEFE:     We goin?

NEEFE:     Cause hot damn son i really wanna crack some commie skulls

Smith also encouraged others to join him and Neefe to travel to Washington on January 6, 2021.  Smith wrote another Facebook user on December 22, 2020, "Hey man if you wanna go down to DC on the 6th Trump is asking everyone to go. That's the day Pence counts up the votes and they need supporters to fill the streets so when they refuse to back down the city doesn't burn down right away.   It's the only time hes ever specifically asked for people to show up.   He didn't say that's why but it's obviously why."

On December 22-23, 2020, Smith messaged other Facebook users to urge them to come to Washington, D.C., "to fill the streets so when they refuse to back down the city doesn't burn down right away," and told a Facebook friend he could "ride down with Me & Marshall."   Smith also

7

told a friend they were buying axe handles and nailing American flags to them, "so we can wave the flag but also have a giant beating stick just in case."

From December 25-26, 2020, Neefe and Smith discussed bringing "batons" with them to Washington on January 6, 2021.   Neefe sent a photograph of a wooden club he had made to Smith and others, with the caption, "Now introducing The Commie Knocker," and commented, "getting prepped for the 6th lol," and, "Going to D.C. to make sure them lil bitches dont burn down the city when trump is announced as president."

On December 31, 2020, Smith continued to message other Facebook users, encouraging them to go to Washington, D.C., on January 6, 2021.   For example, he told one user, "Take off the 6th man!   It's the Big one!!! Trump is literally calling people to DC in a show of force. Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there."

That same date, Neefe and Smith continued to discuss the election results and their plans to attend the upcoming "Stop the Steal" rally in Washington, D.C. on January 6, 2021.   Smith messaged Neefe, "I cant wait for DC! Apparently it's going to be WAY bigger lol.   If it's big enough we should all just storm the buildings. . . .   Seriously. I was talking to my Dad about how easy that would be with enough people."

On January 5, 2021, SMITH commented on another Facebook user's post, "Sacrifice the Senate!!!!"

### *Smith's Participation in the Capitol Attack:*
### *A Cemented Conspiracy, Assault on Officers, and Impeding Law Enforcement Response*

On January 6, 2021, Smith admitted on Facebook that he and Neefe traveled to Washington, D.C., together, and referred to Neefe as his "ride."   Photos and videos taken on

January 6, 2021 and shared on their Facebook pages and via Facebook messenger show both Neefe and Smith outside the Capitol on that date, approaching the Capitol grounds, and on the grounds participating in the riot.   Smith later shared on Facebook a video that shows Smith walking toward the Capitol building with Neefe, stating as they both smiled, "They're rushing the Capitol right now. . . . There's people literally rushing it right now.   Sic semper tyrannis."[3]   Smith sent this video to another Facebook user with the caption "Heres when we first got there and just started rushing it.   First few hundred people to hit it."   Smith's video depicts him and Neefe together, walking towards the Capitol, smiling, with Neefe holding the aforementioned wooden club, as depicted in this image:

---

[3] This is a Latin phrase meaning "thus always to tyrants" and the motto of the Commonwealth of Virginia.   Definition of "Sic Semper Tyrannis," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/sic%20semper%20tyrannis (last visited Aug. 7, 2022).   It suggests and affirms that bad consequences will always befall tyrants and has origins in classical literature and history.   Mike Fontaine, The Real Source behind "Sic Semper Tyrannis," Medium (May 6, 2021), https://medium.com/in-medias-res/the-real-source-behind-sic-semper-tyrannis-b2bc3ddc70dc.
In American history, John Wilkes Booth exclaimed the phrase at Ford's Theater when he assassinated President Abraham Lincoln on April 14, 1865.   *See* From War Department Dispatch to the New York Times, AWFUL EVENT.   President Lincoln Shot by an Assassin, N.Y. Times, Apr. 15, 1865, at 1, available at https://timesmachine.nytimes.com/timesmachine/1865/04/15/p/1 ("During the third act [of the performance that evening,] . . . a man rushed to the front of the President's box, waving a long dagger in his right hand, and exclaiming "Sic semper tyrannis," and immediately leaped from the box . . . to the stage beneath, and ran across to the opposite side, making his escape amid the bewilderment of the audience from the rear of the theatre, and mounting a horse, fled.   The screams of Mrs. Lincoln first disclosed the fact to the audience that the President had been shot . . . .").



On a video he recorded as he approached the Capitol building from the Capitol lawn, Smith stated, with Neefe walking beside him, "We are literally storming the Capitol.  The gate – this whole area is blocked off to the public.  We're saying, 'Fuck it!'  Sic semper tyrannis, bitch. Down with tyrants."  Seconds after Smith made this statement, his video recorded this image of Neefe, raising his club with a flag attached to it above his head and cementing their agreement to obstruct Congress's certification of the Electoral College vote:



In another video Smith recorded after he and Neefe entered Capitol grounds, Smith stated, "We're literally here.   We stormed the gates of the Capitol.   Everybody just kept rushing."   He then turned the camera on Neefe, who appeared to be within arm's length of Smith and was still holding the wooden club in his right hand, and stated, "What's up, Marshall?"   Neefe responded by looking into the camera and nodding affirmatively, again solidifying their conspiracy to obstruct Congress's certification of the Electoral College vote.

On the Capitol grounds, Neefe and Smith walked past barricades, fencing, and signs indicating the grounds were closed to the public, making their way across the Capitol lawn, and positioning themselves a few feet away from a defensive line of Metropolitan Police Department ("MPD") and U.S. Capitol Police ("USCP") officers at the West Front, the site of the temporary stage that was erected in anticipation of Inauguration Day, which was two weeks away.   On the

West Front at approximately 1:30 p.m., Smith and Neefe joined in with the crowd chanting "U.S.A.!" and "traitors," directed at officers holding the defensive line. Shortly thereafter, at approximately 1:31 p.m., Smith and Neefe observed other rioters pepper spraying officers in the defensive line – in a video Smith took with his cellphone and later shared via Facebook messenger, he zooms in on a rioter on the West Front dressed in a camouflage jacket and states "Oh, they're pepper spraying the cops back. Whoo!!"

At approximately 1:38 p.m., Smith and Neefe observed other rioters pull bike racks forming the defensive line into the crowd in an apparent attempt to advance past officers. In a video Smith took with his cellphone and later shared via Facebook messenger, he captures a rioter successfully pulling a bike rack away from the defensive line and shouts "Here it goes, here it goes, boys!" Smith later shared this video, depicted in the screenshot, below, with the caption "right before the line broke":



At approximately 1:40 p.m., Neefe and Smith participated in hoisting and pushing a large metal sign frame holding an oversized "TRUMP" sign into a defensive line of MPD and USCP officers attempting to prevent rioters from further advancing toward the Capitol building.   The all-metal sign frame was at least eight feet tall and 10 feet wide, welded with screws, and supported by large casters that were approximately the size of an adult's head.   As described by USCP Officer N.S., who was part of the defensive line, the sign frame was heavy and very sturdy, taking at least fifteen officers to carry it away after it was thrust into the defensive line and, in part due to the relatively sharp edges of the metal frame, could have "split someone's head open."   Officers such as N.S. and others not wearing a helmet who were near or came in contact with the sign frame were particularly vulnerable to serious injury or worse.

Images of Neefe and Smith participating in the sign-frame assault are depicted below, from opposite angles (Neefe outlined in yellow and Smith outlined in green):





Of note, in the first image, above, Smith was smiling and clapping his hands as others, including

Neefe, grasped the sign frame and pushed it forward.   In the second image, above, both of Smith's

hands are on the frame of the sign as he, Neefe, and others assist in moving the sign forward into the line of defending officers.   Video evidence shows Smith's hands on the sign frame for at least seven seconds, including while the sign made contact with the officers' line.   Smith disengaged from the line only after officers drove him and others back with pepper spray. Smith then used his cellphone to record the sign as it is further advanced into the officer's defensive line until the rioters were pushed back with pepper spray.

The officers who were assaulted with the sign frame and other officers at the Capitol's West Front had defended their lines for over an hour from various confrontations and attacks by the mob.   The hundreds of officers on the West Front were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   Further exacerbating their predicament, officers often had no idea who was armed and who was not.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police's defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were no longer manned defenses between the crowd and several entrances into the Capitol, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent, as depicted in the photos, below:



*Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

16

After the defensive line broke around 2:30 p.m., Smith and Neefe went separate ways. While Neefe entered the Capitol building at the Upper West Terrace Door, Smith stayed on the West Plaza, making his way toward the inauguration stage where he saw a group of rioters pressed up against a door in an apparent attempt to prevent police officers from coming through the door to respond to the mob. In a video Smith recorded and later shared, Smith yelled and encouraged those rioters to keep forcing the door closed so that officers could not respond to the riot:



In the video, Smith shouts "they're holding it back from the police, they're holding the door. Hold

it!" Smith later shared this video via Facebook messenger to numerous Facebook friends with various captions: "Here's us holding the Cops in the building, not letting them get reinforcements to fuck us. They stuck lol;" "Heres guys holding the door closed so we could storm it before reinforcements came out of the doors to GAS us;" "Heres one of keeping reinforcements from coming out of that door;" and "Holding the door shut so reinforcements cant get in while people move closer." Smith ultimately left Capitol grounds between approximately 3:00 and 4:00 p.m. without entering the Capitol building.

### Smith's Statements Shortly after His Participation in the Capitol Attack and Subsequent Conduct

As revealed in his Facebook records, after Smith and Neefe left the Capitol grounds on January 6, 2021, Smith messaged his Facebook friend group, sharing multiple videos he had taken at the Capitol and glorifying his actions. At 3:15 p.m., Smith wrote via Facebook messenger: "We did it. Marshall and I were literally on the front line. Got tear gassed. Fuck 12." At 6:20 p.m., Smith wrote via Facebook messenger "Got Gassed so many times, shit is spicy but the Adrenaline high and wanting to 'Get' Pelosi and those fucks, it was bearable." A few minutes later, at 6:27 p.m., Smith wrote via Facebook messenger:

> We literally did it. We stormed the bitch! Marshall even went in a room and pissed. No bathrooms so… We where front row getting tear gassed and hit/pushed. Made the Child fucking politicians evacuate and escape out the tunnels underground. Some of those dudes would have hung em right there if they found em. I cant even explain how unbelievable that just was. If I would have known what I do now I dont think I would have the balls. But no turning back when 1,000 people are behind you pushing.

At 10:09 p.m., Smith messaged Neefe in reference to their participation in the riot, "[…] we gotta keep him in by any means. I pray for Civil War before bowing down to this. He better use the Trump card. Its really up to the military/people at this point … To bad it wasn't rushed sooner &

18

some of those boogaloo bois could have beheaded them." At 10:29 p.m., Smith commented on another user's Facebook post about the riot and threatened future violence: "It was beautiful and will happen again. Glad to be in the front row." Closing out the day lamenting that no politicians had been harmed in the attack, Smith wrote on Facebook messenger at 11:27-11:41 p.m., "Yeah I think we should have went even harder. To bag nobody found any of the politicians in the building… It went great though. They had to evacuate those faggots. The looks on their faces hahaha."

The following day, January 7, 2021, Smith continued to relish in his crimes and the chaos in which he had participated. At 12:17 a.m., he captioned a photo he posted of himself on the Capitol grounds squinting from apparent effects of teargas, "Gassed like a dirty fucking Jew." At 12:41 a.m., he stated, "Oh yeah. The time will come for some of them. But today's mission was successful! Remember how they said today was the final day & that Biden would be certified? Well we literally chased them out into hiding. No certification lol [. . .].   Pence cucked like we knew he would but that was an Unbelievable show of force and it did its job." At 11:47 a.m., Smith avowed his participation in the violence of the riot, stating on Facebook messenger "Who knows what's going to happen. We need more violent the prices like this it's the only language they speak. *Uprisings." At 2:41 p.m., Smith continued to discuss the aftermath of the attack, stating, "You mean it's nice seeing everybody unify in hating Mitch mcconnell and the republicans and Nancy Pelosi the Dems. Maybe we can all join up in skin them alive." At 2:53 p.m., Smith sent the same user the following meme with the text "I'll fuckin do it again":



At 5:40 p.m., Smith texted Neefe, who was expressing concern that he would be identified by authorities: "My parents know what you where wearing & they didn't see shit either. If everything goes fine The next time we got to be more prepared. Goggles, gas masks and padding. After it was over I just head back goofy meme in my head. The 'I'll fuckin do it again' lol."

In the days following January 7, 2021, as the implications of his crimes became clear, Smith appeared to express remorse, but often in the same messages perseverated on his wish for civil war. On January 9, 2021 at 10:37 a.m., Smith stated via Facebook messenger:

> The only way to save it now would be a full Military revolt to restore the Constitution "their literal oath" & I doubt it at this point. That's alot to ask for…. This is good though. I think the sooner the better when it comes to the War that is coming. Let it come in my time. I dont want to die for anything but I would be willing to risk it for the Constitution. The Founders where literally mass murdering psychopaths who didn't take shit. We just gotta win lol

On January 13, 2021, at 5:03 p.m. Smith, realizing the attack on the Capitol had not secured electoral victory for former President Trump, wrote via Facebook messenger: "I don't think Trump is coming to save the day. I believe it's very possible but what I'm asking from him would be a literal miracle. It would have to be a Pinochet style takeover,[4] which is completely possible but

---

[4] Augusto Pinochet Ugarte was a Chilean dictator and leader of the military junta that overthrew the government of President Salvador Allende on September 11, 1973. Pinochet and his junta were

God damn it runs deep . . ."

On January 13, 2021, at 6:21 p.m., Smith wrote to a different Facebook user, "Thank God I didn't go in or assault anyone. Probably shouldn't have went in at all but in the long run it was cool to see history." In a continuation of the same conversation, from 7:14-7:17 p.m., Smith wrote "It finally hit Marshal… Hit me the night going back but I didn't want to say it. After I saw pictures of what happened."

On January 14, 2021, at 4:53 p.m. Smith wrote via Facebook messenger:

 I really botched it with the "Rally". I didn't do anything illegal, all 1st amendment shit but what that turned into was to much. I would have stayed home. Not that I'm worried about getting fucked, but them having my name and watching me…. I've been aware of our countys downfall since the end of 5th grade so I'm not destroyed by what is happening, Trump was a flash in the pan miracle and gave me hope that it could be turned around. I think the big split/war in our country will come even sooner than I thought. God willing Because it's either we fight back or just lay down and die.

### *Smith's Arrest and Postarrest Interviews*

Federal Bureau of Investigation ("FBI") agents arrested Smith at his home in Shippensburg, Pennsylvania, on September 13, 2021.   Following his arrest, he gave a voluntary, post-*Miranda* interview with the FBI.   As reported in the FBI's summary of that interview, Smith said he was initially proud to have been at the Capitol on January 6, 2021, and stated he felt like a journalist, recording history on his phone that day.

Smith said that after traveling to Washington with Neefe and attending the rally President

---

widely condemned for their harsh, often violent, suppression of dissent – torturing tens of thousands of opponents during their regime. In 2005, Pinochet's presidential immunity from prosecution was removed by the Chilean Supreme Court and he was set to stand trial on charges stemming from the disappearance and execution of political opponents, however, he died the following year before the trial could take place. *Augusto Pinochet*, https://www.britannica.com/biography/Augusto-Pinochet (last visited August 30, 2022).

Trump had planned at the Ellipse, he and Neefe walked with the crowd to the Capitol after President Trump made mention for the crowd to "march" on the Capitol.   Smith admitted walking over a mesh fence on the grounds to get closer to the Capitol building.   He left his KA-BAR knife in the truck they traveled in, which was parked at the Shady Grove Metro Station because he thought it was illegal to carry a knife into D.C. Smith later admitted he had brought the KA-BAR knife on the trip to serve as protection and left it in the car to avoid any metal detectors. Smith stated he routinely carries/wears his KA-BAR for protection while running errands, but as he is now registered to conceal carry, he takes his gun everywhere instead.

Smith admitted he captured many images and videos of events at the U.S. Capitol on January 6, 2021 and specifically admitted to recording a video of individuals preventing police officers from exiting one of the doors of the Capitol building. Smith recalled he had stated something like "Yeah, this is awesome" and "Hold it!" while the door was being blocked. Smith stated that he now felt what he said was stupid because the officers were trapped inside.

Smith said that around 2:30 p.m. or 3:30 p.m., he received a D.C. city-wide text message implementing a curfew, and though he and Neefe were separated, he made his way through the crowd and off the grounds. Smith thought Neefe would certainly be arrested and was not certain how he would get home, but shortly after reaching the vehicle parked at Shady Grove, he received a call from Neefe, who used a stranger's phone to contact him. When confronted with some of the Facebook messages Smith had written pertaining to the riot Smith characterized his communications as stupid and joking around a lot.

On March 10, 2022, Smith participated in a voluntary debrief with the FBI for over two hours. In the debrief Smith was mostly forthcoming but not completely candid in some regards,

for instance, falsely asserting that other rioters threatened him to take part in the sign assault, and initially indicating he voluntarily let go of the sign once he realized it was being used as a battering ram.

### *Injuries*

The government has identified at least three victims of the assault with the large metal sign frame: MPD Officers S.B. and J.C. and USCP Officer N.S.  Although none of these officers reported suffering any physical injuries during the assault, Smith's participation in this riot aided those rioters who did succeed in injuring officers.  *See* Section II(A) ("Injuries to Law-Enforcement Officers Caused by the January 6, 2021, Attack"), *supra.*  His violent conduct served to incite and embolden other violent rioters around him.

## III.    THE CHARGES AND PLEA AGREEMENT

On January 26, 2022, a federal grand jury returned a superseding indictment charging Smith with 10 counts.  On June 23, 2022, Smith pleaded guilty to Count One, Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k), and a lesser-included offense of Count Four, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2.  The lesser-included offense of Count Four does not include the charged weapon enhancement under 18 U.S.C. § 111(b).

## IV.    STATUTORY PENALTIES

Smith now faces sentencing on Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k) (Count One), and Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2 (lesser include offense of Count Four).

As noted by the plea agreement and the U.S. Probation Office ("USPO"), Smith faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Conspiracy to Obstruct an Official Proceeding.

As noted by the plea agreement and the USPO, Smith faces up to eight years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The PSR does not include a Guidelines analysis for both Counts—Counts One and Four— to which Smith pleaded guilty. (*See* PSR at 12-13.)   Sections 1B.1(a)(1)-(3) of the Guidelines describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments.   Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis as set out in U.S.S.G.

§ 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The PSR did not follow these steps. It concludes (PSR at ¶ 53) that Counts One and Four group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

Count One: 18 U.S.C. § 1512(k)

| U.S.S.G. § 2X1.1(a), (b): | Conspiracy Cross-Reference | |
|---|---|---|
| U.S.S.G. § 2J1.2(a): | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B): | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2B1.1(b)(2): | Resulted in Substantial Interference with Administration of Justice | +3 |
| | **Total:** | **25** |

Count Four: 18 U.S.C. §§ 111(a)(1), 2

| U.S.S.G. § 2X2.1: | Aiding and Abetting Cross-Reference | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[5]: | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B): | Dangerous Weapon Used | +4 |
| U.S.S.G. § 3A1.2(b): | Official Victim | +6 |
| | **Total** | **24** |

| | |
|---|---|
| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **22** |

(*See* ECF 78 (Plea Agreement) at 3.)

---

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

In any event, the government agrees with the USPO's conclusion that Smith's total offense level is 22. (PSR at ¶ 65.) The USPO calculated Smith's criminal history as category I, which the government also does not dispute. (PSR at ¶ 68.) Accordingly, based on the government's and the USPO's calculation of his total adjusted offense level, after a three-level downward adjustment under U.S.S.G. § 3E1.1(a) and (b) for acceptance of responsibility, (PSR at ¶ 63-64), Smith's Guidelines imprisonment range is 41-51 months. (PSR at ¶ 105.) Smith's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a 44 month term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the Capitol building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

26

While each defendant should be sentenced based on his or her individual conduct, all individuals who entered the Capitol and its grounds, and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As individuals entered the Capitol grounds, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place individual defendants on a spectrum as to their fair and just punishment.

The nature and circumstances of Smith's crimes weigh heavily towards a term of incarceration.   Smith's planning, statements, and actions before and leading up to his participation in the riot demonstrate that he conspired with Neefe to obstruct an official proceeding, that is, Congress's certification of the Electoral College vote count, on January 6, 2021.

As the formal voting by the Electoral College took place on December 14, 2020, Smith and Neefe were watching avidly, exchanging messages on Facebook as the votes were cast, ultimately refusing to accept the result, and advocating for a violent overthrow to prevent the peaceful transition of power.

A week later, December 22-23, 2020, Smith and Neefe's plans to travel to Washington on January 6 progressed and Smith attempted to recruit as many participants as possible, messaging multiple Facebook users to "fill the streets so when they refuse to back down the city doesn't burn down right away."   Smith proudly touted the plan to travel to D.C. armed and told a friend he and Neefe contemplated buying axe handles and nailing American flags to them, "so we can wave the flag but also have a giant beating stick just in case." On December 31, 2020, Smith continued to tout the expected significance of January 6th and potential for violence: "Take off the 6th man! It's the Big one!!! Trump is literally calling people to DC in a show of force.  Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there."

On January 6, 2021, Smith and Neefe executed their conspiracy when Smith proclaimed, "We are literally storming the Capitol," as they unlawfully entered the Capitol grounds and Neefe raised his wooden club in an affirmative gesture.   After entering the grounds at the West Front, Smith and Neefe joined a simmering mob intent on its goal to breach the Capitol and "stop the steal," with a multitude of individuals angrily confronting police officers who desperately attempted to secure a perimeter so rioters could not advance toward the Capitol.

During a particularly precarious point in the riot, numerous rioters hoisted a large, heavy metal sign frame supporting an oversized "TRUMP" sign and pushed it forward toward a line of

officers in front of the Capitol's Lower West Terrace.   As the videos Smith recorded show, Smith and Neefe were positioned close to this defensive line, and as the sign frame neared them, they joined in grasping the sign above their heads and pushing it forward into the officers.   Smith encouraged this assault by smiling and clapping as the sign passed over his head.   He then grasped the sign for at least seven seconds—including while the sign frame made contact with the officers—and can be seen in surveillance thrusting the sign frame forward with both hands.   Smith retreated a short distance when officers drove him and others back with pepper spray. After he rubbed his eyes for a few seconds, he collected himself to record the remaining duration of the assault with the sign frame, evidencing his desire for the assault to continue.

Even after crossing clear barriers, participating in the assault of officers, and getting sprayed with a chemical irritant, Smith was undeterred.   After the police line in front of the Lower West Terrace broke, Smith advanced toward the Capitol.   By his own admission, Smith encouraged other rioters to hold a door closed to officers attempting to respond to the continued melee on the Lower West Terrace.   Smith ultimately left the Capitol grounds sometime after he received a city-wide curfew message, likely between 3:00 and 4:00 p.m., without entering the Capitol building.   By his actions, Smith directly participated in unleashing a violent mob on the Capitol and delaying the certification of the Electoral College vote, dimming the brightness of the United States' democratic beacon for generations to come.

Smith's choices on January 6 showed an absolute disregard for the rule of law coupled with an eagerness to engage in violence.   In his Facebook messages after the riot, Smith celebrated and endorsed delaying the certification of the Electoral College vote by violence: "Made the Child fucking politicians evacuate and escape out the tunnels underground. Some of those dudes would

have hung em right there if they found em. I cant even explain how unbelievable that just was."
Smith glorified being part of the riot as "hard to process how badass that was," and congratulated
other rioters on breaching the Capitol building in an unprecedented attack: "the Confederate battle
flag hadn't been flown in the US Capitol in a long time. It was time to come home lol."   Then,
alongside his coconspirator, Smith threatened that worse was yet to come.   On the night of January
6, as Smith realized former President Trump had not been installed as President, he wrote, "we
gotta keep him in by any means. I pray for Civil War before bowing down to this. He better use
the Trump card. Its really up to the military/people at this point … To bad it wasn't rushed sooner
& some of those boogaloo bois could have beheaded them" and threatened the riot "was beautiful"
and "will happen again," congratulating himself on being "in the front row."

    As noted above, Smith agreed to a custodial interview after his arrest on September 21,
2021, and he candidly admitted to participating in the riot, including encouraging other rioters to
prevent law-enforcement response. However, Smith did not initially mention his involvement in
the sign assault.   During his interview, he also admitted that his conduct was "stupid," though he
minimized many of his statements on Facebook about the riot as "jok[ing] around a lot."
Smith also participated in an additional interview that lasted over two hours. During this interview,
Smith expressed remorse and said he does not feel good about what happened. As described above,
Smith was largely forthcoming about his participation in the riot, indicating he was involved with
the sign assault and had not initially mentioned his involvement because he did not want to get
Neefe in trouble, and because he was out of his elements in the FBI interview and had forgotten
about the sign assault. Smith was, however, not fully candid about other details of the assault,
asserting that other rioters threatened him to participate in the sign assault. The video evidence –

which shows Smith smiling and clapping as the sign passes over his head – belies this claim.

Despite these somewhat mitigating factors, the seriousness of Smith's offenses—including his preplanning and agreement to obstruct the Electoral College certification and participation in the sign assault—demands a reasonable sentence of imprisonment.

### B.      Smith's History and Characteristics

Smith has no prior criminal convictions.    But his characteristics provide ample evidence of prior potential criminal conduct and other troubling behavior. Dismayed by the election results being tallied after Election Day, Smith expressed a desire for violent action as early as November 4, 2020. After Neefe stated he hoped the country would " burn[] either way," Smith replied, "Me to. This county needs to split up immediately."   When social media companies began to restrict the dissemination of election misinformation in early December 2020, Smith saw a further opportunity for division, stating, "If SCOTUS doesn't act people are going to die. I hope this starts the War."

Smith has a history of abusing controlled substances while possessing firearms and ammunition.   As revealed in his Facebook records, in November and December 2020, Smith admitted to routinely using "dabs" of marijuana concentrate, a controlled substance and a more potent form of cannabis product than a typical marijuana cigarette or "joint."   Smith also admitted to using lysergic acid diethylamide ("LSD"), a hallucinogenic controlled substance in his communications with Neefe, stating "I literally do it everyday."   When Smith was arrested in September 2021, he admitted to the Pretrial Services Agency ("PSA") that he had recently used alcohol but downplayed his recent use of cannabinoids and other drugs as evinced by his Facebook communications. While under pretrial supervision after his arrest, Smith admitted to

31

using cocaine on May 15, 2022 at work with another coworker. (PSR at ¶ 15.)

In addition, Smith's Facebook communications reveal that during the period from November 2020 until his arrest in September 2021, he possessed ammunition and firearms. Smith further admitted to the PSA that he owned at least three firearms, a nine-millimeter Taurus handgun, a .45 caliber Kimber handgun, and an AR-Palmetto AKA AR-15 rifle.   The Facebook evidence and Smith's own admissions underscore the danger of having an individual with his history of substance abuse possess loaded firearms. *See, e.g.,* 18 U.S.C. 922(g)(3) (criminalizing possession of firearms or ammunition for addicts).

Facebook records also reveal that January 6, 2021 was not the first time Smith contemplated bringing a weapon to a political confrontation in Washington.   In conversations with Neefe in November 2020, Smith and Neefe made plans to travel to another pro-Trump rally in Washington on November 14, 2020.   During these conversations, Smith noted he was "bringing a pocket knife" to the rally, and said he "had pocket knifes there b4," belying Smith's later assertion that he believed it was illegal to carry a knife in D.C.

Smith's history of potentially unlawful possession of firearms and ammunition, dangerous behavior, and extremist rhetoric coupled with violent ideations militate in favor of a sentence of incarceration.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration

of the democratic process."[6]   As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.

Smith's criminal conduct—conspiring to corruptly obstruct an official proceeding and assaulting law-enforcement officers—is the epitome of disrespect for the law.  He engaged in considerable planning to travel to Washington on the date of the certification proceeding.  He discussed "storm[ing]" the Capitol, and prepared for violent confrontation, noting the ease of "taking out the trash."   When he entered the Capitol grounds, it was abundantly clear to Smith that lawmakers, and the police officers who tried to protect them, were under siege.   Police officers were overwhelmed, outnumbered, and in some cases, in serious danger.   Through his direct actions during the assault with the sign frame—an attack he literally applauded as it occurred—Smith further imperiled the officers and other individuals.

The rule of law was not only disrespected; it was under siege that day. Indeed, disappointed by the democratic process and emboldened by the violence around him, Smith sought to thwart a Constitutional process, wantonly impelling officers defending the Capitol against a prolonged attack. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at:

  https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, although Smith has a criminal history category of I, his history of engaging in violent, extremist rhetoric shows a clear pattern of alarming and violent ideations.   *See* Section VI(B) *supra*.   Second, while Smith admitted to the FBI that his conduct was "stupid" and expressed some remorse after he was arrested, Smith's actions immediately following the Capitol riot belie his post arrest assertions.   His social-media statements on the night of January 6 were those of an unrepentant man girding for another battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home. It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Smith's own statements that it was "hard to process how badass that was," his desire to "join up in skin them

35

alive," and vow that the riot was "beautiful and will happen again," demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of extremism and violent rhetoric.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants before January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As noted above, Smith pleaded guilty to Conspiracy to Obstruct an Official Proceeding under 18 U.S.C. § 1512(k) (Count One) and Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting under 18 U.S.C. §§ 111(a)(1) and 2 (lesser included offense of Count Four). As of the date of this sentencing memorandum, no other Capitol rioter had been sentenced

for the conspiracy offense under 18 U.S.C. § 1512(k).   But four defendants so far have been sentenced for committing the substantive offense under § 1512(c)(2) in addition to a violation of § 111(a)(1), and each received sentences of incarceration ranging from 33 to 51 months.[8]

First, in *United States v. Matthew Miller,* 12-cr-00075 (RDM), the court sentenced the defendant to 33 months in prison.   While on the Capitol grounds, Miller, a 22-year-old, threw a full beer can in the direction of police officers.   After watching other rioters repeatedly assaulting officers in the Lower West Terrace entrance to the Capitol—commonly referred to as the "tunnel," the site of a prolonged siege and countless attacks on officers lasting over three hours—Miller chose to join them.   He encouraged rioters to push against the police lines formed to keep the mob from entering, then unleashed the contents of a fire extinguisher directly onto officers in the tunnel. The court varied downward two levels—citing Miller's youth and his intoxication during the riot— and imposed 33 months in prison as well as 24 months of probation concurrent to a period of supervised release.

At the time of his offenses on January 6, 2021, Smith was two years older than Miller. Even assuming that voluntary intoxication is a mitigating factor at sentencing, there is no indication Smith was intoxicated when he stormed the Capitol.   Indeed, he appeared quite sober throughout his criminal conduct that day.   There is no reason to vary downward here.

Second, in *United States v. Greg Rubenacker,* 1:21-cr-00193 (BAH),[9] the court sentenced the defendant to 41 months in prison.   Rubenacker was one of the first people to breach the

---

[8] Each of these defendants, like Smith, had a criminal-history category of I.

[9] Rubenacker pleaded guilty to all nine counts in his superseding indictment without a plea agreement.   They were violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1), 18 U.S.C. § 231(a)(3) (Civil Disorder) and six misdemeanors.   The additional charges of conviction did not affect the Guidelines range of 41-51 months, which is also the correct range for Smith.

Capitol, entering the Senate Wing Doors within 60 seconds of the initial breach of the building. Inside, he and other rioters chased USCP Officer Eugene Goodman through part of the Capitol, ignoring the officer's extended baton and repeated demands to "back up," and accosted other officers.   Rubenacker left the building, only to breach it again elsewhere.   This time, he pushed down the Senate Hall toward the Senate Chamber before being repulsed again by police deploying pepper spray.   Retreating to the Rotunda, Rubenacker refused to leave and confronted multiple officers, screaming that they were "communists."   When officers formed a line to force rioters out, Rubenacker swung a water bottle at one officer's head and threw liquid at other officers who were engaging with another rioter.   Only after an officer sprayed a chemical irritant in Rubenacker's face did he finally leave the Capitol, over one hour after he initially breached the building.   Following the riot, Rubenacker posted comments to videos on social media in which he did not show remorse ("America is pissed") and exuded pride for his participation in the riot ("Holy shit! This is history! We took the Capitol!").

Like Rubenacker, Smith confronted officers: he joined the crowd in taunting chants of "traitor;" participated in an assault on officers in a defensive line; and made multiple post-riot social-media posts and communications exalting his actions that day.   Though Rubenacker breached the Capitol and Smith did not, Smith engaged in other conduct meriting a longer period of incarceration: extensive preplanning with a coconspirator and joining others in assaulting multiple officers with a dangerous weapon, the large metal sign frame.   Further, Smith threatened additional violence, which Rubenacker did not do.   Therefore, Smith deserves a mid-range sentence of 44 months.

Third, in *United States v. Scott Fairlamb,* 1:21-cr-00120 (RCL), this Court sentenced the

defendant to 41 months in prison.   Fairlamb joined the storming of the police line on the West Terrace, obtained a police baton, and screamed, "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!"   Fairlamb brandished that same police baton while entering the Capitol through the Senate Wing Door, which had been kicked out by rioters only one minute before his entry. Fairlamb spent under 10 minutes inside the building.   After exiting, he aggressively followed a line of dramatically out-numbered MPD officers and screamed vitriol at them.   He isolated one of the officers, shoved him, then punched his face shield.   Two days after the riot, on January 8, 2021, Fairlamb filmed an ominous video, later seized from his cellphone, that threatened future violence, in which he stated, "they pulled the pin on the grenade, and the blackout is coming.   What a time to be a patriot."   Immediately after FBI agents visited him on January 15, 2021, he said that he would "go again" to the Capitol.

Both Fairlamb and Smith showed no remorse shortly after the Capitol riot and threatened future violence.   Fairlamb filmed the ominous selfie video, while Smith told others about how the riot "was beautiful and would happen again" and opined that "we need more violent uprisings like this it's the only language they speak," musing about politicians who did not do his bidding, "Maybe we can all join up in skin them alive," and promising, "I'll fuckin do it again."    While Fairlamb played a more direct role in assaulting an individual police officer and harassing other officers, Smith participated in an assault of multiple officers—albeit for a short time—with a dangerous weapon that posed greater potential for serious injury or worse. Indeed, the sign assault necessitated the participation of numerous individuals, without any one of them, the sign could not have been lifted and utilized as a battering ram; Smith was therefore a critical part of a concerted effort to break the police line and get more rioters into the Capitol. This violent and strategic attack

arguably had more of an effect on police defense at the Capitol as a whole than Fairlamb's individual actions. Finally, Smith engaged in more extensive planning with a coconspirator. Therefore, Smith merits a 44 month sentence.

Fourth, in *United States v. Duke Wilson,* 1:21-cr-00345 (RCL), this Court sentenced the defendant to 51 months in prison.   Wilson, like Miller, attempted to gain entrance to the Capitol through the doors at the Lower West Terrace tunnel.   Dozens of officers in riot gear were protecting that entrance, and upon seeing the mob approaching, officers attempted to close and lock the doors.   Before they could, Wilson lunged toward the door and prevented it from closing, allowing other rioters to help pry it open and attack officers.   Soon after, dozens of individuals, including Wilson, punched, shoved, and kicked officers and attempted to steal their riot shields. Officers responded, in part, by spraying the crowd of rioters with a chemical irritant in an effort to force them to leave the area.   Undeterred, Wilson picked up a several-feet-long white cylindrical object, believed to be a thin polyvinyl-chloride ("PVC") pipe, and indiscriminately struck at the officers with it, hitting one officer.   After assaulting that officer with the thin PVC pipe, Wilson threw it into the crowd of officers, striking another officer.   Wilson spent approximately 14 minutes in the tunnel.

Wilson's participation in the infamous siege at the tunnel, including his principal involvement in the assaults of two officers and wanton disregard for officers' safety, was self-initiated, longer, and more involved than Smith's briefer participation in the sign assault.   Though Smith engaged in planning with a coconspirator, and issued future threats of violence following the riot, Wilson's conduct was more egregious

Finally, the government has advocated for a 46-month sentence for Smith's codefendant,

41

Neefe.   (ECF 84 at 1, 34-38.)   Based on their Facebook communications, Smith appeared to be a more enthusiastic conspirator, as his statements regarding the planning and intentions behind traveling to Washington on January 6 exceeded Neefe's.   The volume of Smith's extremist and violent comments also surpassed Neefe's.   But the government views Neefe as the more culpable rioter because Neefe took the extra significant steps of entering the Capitol, remaining inside for over forty minutes, and disregarding commands of police officers to leave the building, while Smith stayed outside. Neefe further took the extraordinary step of fabricating a weapon that he brought to the Capitol grounds.   By contrast, Smith traveled to Washington with a knife he purchased for the occasion, but the government did not uncover evidence that he brought that weapon to the Capitol grounds.   For these reasons, Smith deserves a lower sentence than Neefe.

Accordingly, a sentence of 44 months for Smith would not create an unwarranted disparity.[10]

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[11] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the

---

[10]  Attached to this sentencing memorandum is a table (current as of September 17, 2022) providing additional information about the sentences imposed on other Capitol breach defendants.   That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[11]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.   *See* 18 U.S.C. § 3663A(c)(1).

loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officers M.B., J.C., and N.S., did not suffer bodily injury as a result of Smith's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Smith must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Smith played in the riot on January 6.[12] (ECF 66 at 8-9.)   Smith's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Smith to 44 months in prison, which is a low-end sentence within the Guidelines calculation that the parties agreed upon in the plea agreement, three years of supervised release, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

---

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     /s/ *Courtney Lee*
        COURTNEY LEE
        Assistant United States Attorney
        D.C. Bar No. 241291
        202-252-7650
        courtney.lee@usdoj.gov

        /s/ *Seth Adam Meinero*
        SETH ADAM MEINERO
        Trial Attorney (Detailee)
        D.C. Bar No. 976587
        202-252-5847
        seth.meinero@usdoj.gov

        United States Attorney's Office for the
          District of Columbia
        601 D St., N.W. - Room 4.12
        Washington, DC 20530

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 19, 2022, I served a copy of this pleading on all

parties to this matter as indicated in the Court's electronic case files system.

        /s/ *Courtney Lee*
        COURTNEY LEE
        Assistant United States Attorney

44